

EXHIBIT 1

**Reservation Number:** 2/60306 20

**Condominium Unit Number:** E/02

THIS AGREEMENT, made and entered into on this 20 day of 9 , 201 6 , by and between Hyde Morgan Development, LLC, a Delaware limited liability company, hereinafter referred to as "Seller", and _____ Wu ✓un _____ hereinafter collectively referred to as "Buyer", whether one or more.

In consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

1. Purchase and Sale. Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase and pay for, the following resort condominium unit to be located in the City of Coachella, State of California (the "Unit"):

Unit # E/02 with total area of 712 square feet of the Hyde Coachella Valley Resort & Residences (the "Resort") to be located on the SW Corner of Harrison and Vista Del Norte on Parcel Nos. 601-400-002, 601-400-050, and 601-400-052, further described as 85200 Vista Del Norte within the City of Coachella, County of Riverside, State of California, USA.

Together with the furniture, art, rugs, accessories and other items that are to be located in the Unit at the closing (the "Closing") of the transaction contemplated hereunder (the "Furniture Package"; the Unit and Furniture Package are collectively herein referred to as the "Condominium Unit").

Buyer shall take title to the Unit as [ ] tenants in common, [ ] joint tenants, [ ] an individual or [ ] other (to be determined in escrow) (check appropriate box, if any).

2. Total Purchase Price: The total purchase price for the Condominium Unit to be paid by Buyer to Seller is $ 450,000 (the "Purchase Price") which will be payable in two stage payments (collective, "Stage Payments," and each, a "Stage Payment"). The sums described herein are not inclusive of additional fees ("Purchasing Costs") that may be due to third parties such as ( but not limited to) title agencies, escrow, lenders, regulatory authorities and taxing agencies.

3. Payment Schedule: Buyer shall pay the entire Purchase Price of the Condominium Unit (including any and all Purchasing Costs) in two Stage Payments, with a deposit equal to forty percent (40%) of the Purchase Price (the "Deposit") due upon execution of this Agreement and

the balance due at the Closing. Notwithstanding anything to the contrary contained in this Agreement, the Deposit shall be non-refundable except as expressly set forth in this Agreement. Please note that each such Stage Payment must include Buyer's bank sending fees. The Deposit shall be paid within seven (7) days after the execution of this Agreement.In the event the payment of Deposit is delayed after the seventh day after the execution of this Agreement due to the act or omission of Buyer, the outstanding and over-due payment shall bear interest at the daily rate of ELEVEN HUNDREDTH PERCENT (0.11%) which shall accrue on a daily basis commencing from the original payment due date.

4. <u>Intentionally Omitted</u>.

5. <u>Condominium Unit Condition</u>: Seller agrees to deliver the Condominium Unit in new condition and to transfer to Buyer, on a non-exclusive basis, all manufacturers' warranties related thereto. Seller does hereby certify and represent that at the Closing, Seller will have the authority and capacity to convey the Condominium Unit with all fixtures and fittings located therein. Seller further certifies and represents that at the Closing, Seller will know of no latent defects to the Condominium Unit and will know of no facts materially affecting the value of the Condominium Unit.

6. <u>Completion Date</u>: Seller estimates that it will substantially complete construction of the Condominium Unit, in the manner specified in this Agreement, by approximately December 31, 2016, subject, however, to delays resulting from "Force Majeure" (the "Outside Date"). As used in this Agreement, the term "Force Majeure" shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions or delays by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control.

7. <u>Pre-Closing Contingency</u>: Notwithstanding anything to the contrary set forth in this Agreement, Seller shall have the right, in Seller's sole discretion, to terminate this Agreement and cause the Deposit to be refunded in the event that Seller does not enter into binding contracts to sell at least eighty percent (80%) of the units in the Resort (the "Presale Threshold") on or prior to _____ 31ᵗʰ, 12 _____, 2016 (the "Contingency Expiration Date"). Seller must, however, notify Buyer of such a termination of the Agreement pursuant to this Paragraph within thirty (30) days following the Contingency Expiration Date. The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to waive such presale contingency, whether or not the stated Presale Threshold has been met. In the event that Seller does elect to proceed without having met the Presale Threshold, Buyer will have no right to object thereto and shall remain bound by the terms of this Agreement. This Section shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. In the event of Seller's termination of this Agreement pursuant to this Section, Buyer shall be entitled to an immediate refund of the Deposit and upon such termination and the return of the Deposit, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection with this Agreement. Seller agrees to use its good faith efforts to meet the Pre-Sale Threshold, provided, however, that while Seller recognizes that there may be some seasonal variations, Seller may reasonably anticipate sales to occur at a relatively consistent rate throughout the presale contingency period. As such, to the extent that, prior to the Contingency Expiration Date, Seller reasonably believes that the sales will not achieve the Presale Threshold, then Seller may terminate this Agreement prior to the Contingency Expiration Date, and such termination shall not be deemed a breach of Seller's obligation to use its good faith efforts to achieve the Pre-Sale Threshold.

a)   Buyer understands and agrees that Seller has the right to schedule the date, time and place for Closing, which shall in no event be scheduled later than one (1) year following the Outside Date. Before Seller can require Buyer to close, however, Seller must obtain a temporary, partial or permanent certificate of occupancy for or covering the Condominium Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a Unit may be occupied). Buyer will be given at least ten (10) days' notice of the date, time and place of Closing. Seller is authorized to postpone the Closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given). A change of time or place of Closing only (one not involving a change of date) will not require any additional notice period. Buyer understands that (i) Seller is not required to reschedule or to permit a delay in Closing at Buyer's request and (ii) on the Closing Date, the construction of other units and portions of the Resort may not be fully completed, and that such circumstances shall not in any way affect Buyer's obligations to make the required payments under this Agreement and to close the sale of the Condominium Unit.

b)   On the Closing Date, Seller shall execute and deliver a grant deed conveying title to the Unit, and Seller and Buyer shall each execute and deliver (i) the Resort Condominium Buy-Back Agreement attached hereto as Exhibit A (the "Buy-Back Agreement") and (ii) the Hyde Coachella Valley Resort & Residences Unit Lease-Back Agreement Under Management of: SBE attached hereto as Exhibit B. Subject to the terms of such agreements, Buyer is entitled to possession of the Condominium Unit immediately after Closing and transfer of title.

9.   Inspection Prior to Closing. Buyer may inspect the Condominium Unit before the Closing and shall, at least five (5) days prior to closing, specify by written notice to Seller any alleged defects in workmanship or materials (only within the boundaries of the Unit itself) that Buyer discovers (herein called "Discrepancies"). Except as to those Discrepancies set forth in such written notice, acceptance of a grant deed to the Unit by Buyer shall be deemed to be an acknowledgment of full performance and discharge of all obligations of Seller hereunder. If a notice of Discrepancies is given before the Closing, the parties shall agree by instrument in writing that Seller shall cure all, none, or certain Discrepancies specifically listed therein as soon after Closing as is reasonably practicable.

10.   Risk of Loss. Risk of loss passes from Seller to Buyer at the Closing. In the event the Condominium Unit shall be substantially and materially damaged or destroyed by fire or other casualty prior to the time of closing, this Agreement may be terminated at the option of either Seller or Buyer, and if so terminated, then Buyer shall return all documents delivered to Buyer in connection with this Agreement and Seller shall repay to Buyer all earnest money paid under

this Agreement, after which neither party shall have any further obligation to the other hereunder. If this Agreement is not terminated, the damage shall be repaired by Seller and the date for closing shall be extended by such reasonable period as is necessary to complete the repairs.

11. Warranty and Limitations:

a)   At the Closing, any rights of Seller under manufacturers' warranties of products installed as a part of the Condominium Unit are hereby assigned, on a non-exclusive basis, by Seller to Buyer to the extent they are assignable, and any and all warranty claims thereunder shall be made directly by Buyer to the manufacturer providing the warranty, if any, and Seller and its contractor shall have no liability therefore. The manufacturer's warranty, if any, is the exclusive and only warranty on such products, and Seller neither makes nor adopts any warranty of any nature regarding such items and disclaims all warranties, including but not limited to those of MERCHANTABILITY or FITNESS FOR A PARTICULAR PURPOSE.

b)   THE PARTIES AGREE THAT SELLER HAS MADE ABSOLUTELY NO REPRESENTATIONS, WARRANTIES OR PROMISES OF ANY NATURE, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THOSE REGARDING MERCHANTABILITY, HABITABILITY, DESIGN OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE WITH RESPECT TO THE CONDOMINIUM UNIT OR THE RESORT, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES. SELLER SPECIFICALLY DISCLAIMS, AND BUYER SPECIFICALLY RELEASES SELLER FROM, ANY LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES TO ANY PERSON OR THE CONDOMINIUM UNIT OR ANY OTHER REAL OR PERSONAL PROPERTY RESULTING FROM A DEFECT OR ANY OTHER CAUSE. THIS RELEASE INCLUDES (AND BUYER HEREBY EXPRESSLY WAIVES ANY BENEFITS OF APPLICABLE LAW TO EXCLUDE) CLAIMS OF WHICH BUYER IS PRESENTLY UNAWARE AND OF WHICH BUYER DOES NOT PRESENTLY SUSPECT TO EXIST WHICH, IF KNOWN BY BUYER, WOULD MATERIALLY AFFECT BUYER'S RELEASE OF SELLER. IN THIS REGARD AND TO THE EXTENT PERMITTED BY LAW, BUYER HEREBY AGREES, REPRESENTS AND WARRANTS THAT BUYER REALIZES AND ACKNOWLEDGES THAT FACTUAL MATTERS NOW UNKNOWN TO BUYER MAY HAVE GIVEN OR MAY HEREAFTER GIVE RISE TO CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGES, COSTS, LOSSES AND EXPENSES WHICH ARE PRESENTLY UNKNOWN, UNANTICIPATED AND UNSUSPECTED, AND BUYER FURTHER AGREES, REPRESENTS AND WARRANTS THAT THE WAIVERS AND RELEASES CONTAINED HEREIN HAVE BEEN NEGOTIATED AND AGREED UPON BY BUYER IN LIGHT OF THAT REALIZATION AND THAT BUYER NEVERTHELESS HEREBY INTENDS TO RELEASE, DISCHARGE AND ACQUIT SELLER FROM ANY SUCH UNKNOWN CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGES, COSTS, LOSSES AND EXPENSES.

$$\underline{\quad\text{ZZ}\quad}$$

BUYER'S INITIALS

c)   Buyer represents that Buyer has read this Agreement and the provisions referred to

above, and except those expressly set forth in this Agreement in writing, no other agreement, promise, representation or warranty has been made to Buyer by Seller or its brokers, salesmen, agents or employees to Buyer. Buyer acknowledges that Buyer is not relying upon any statement, representation or warranty not set forth in writing in this Agreement.

d)   Buyer acknowledges that neither Seller nor any of its brokers, employees or agents have made any warranties or representations concerning (i) the Condominium Unit as an investment opportunity for appreciation of value or as a means of obtaining income from the rental thereof, or (ii) rental or other income from any property or as to any other economic benefit, including possible federal or state tax advantages from the ownership of the Condominium Unit. Seller hereby expressly disclaims and repudiates any representation from any source as to any possible economic benefit arising from ownership of the Condominium Unit. Buyer acknowledges that no sales counselor, employee, agent of Seller or broker has authority to modify the terms hereof or to make any agreements, representations, warranties or promises regarding the Condominium Unit, the Resort, the surrounding properties, or any other item relating to this Agreement, unless the same are expressly set forth in this Agreement.

e)   The limited warranty set forth in Paragraph 11(a) above has been prepared to comply with the disclosure requirements of the federal Magnuson-Moss Warranty – Federal Trade Improvements Act (15 U.S.C. §2301, as amended). With respect to any appliances finally determined by a court to be within this limited warranty described above, all implied warranties are limited in duration to the period of this limited warranty. This includes, without limitation, the implied warranties of MERCHANTABILITY and FITNESS FOR A PARTICULAR PURPOSE if created or recognized in California.

f)   Buyer hereby acknowledges and accepts the foregoing disclaimers and agrees to waive any and all rights Buyer may have by virtue of the representations and warranties disclaimed. Except as otherwise provided in an applicable manufacturer's warranty, Buyer assumes the risk of damage occurring in the Condominium Unit after closing regardless of the cause.

g)   The provisions of this Paragraph 11 shall survive the Closing.

12. Default and Arbitration:

a)   SHOULD BUYER ELECT NOT TO FULFILL BUYER'S OBLIGATIONS UNDER THIS AGREEMENT, THE DEPOSIT WILL BE RETAINED BY THE SELLER AS LIQUIDATED DAMAGES AND FULL SETTLEMENT OF ANY CLAIM, AND SELLER WILL BE RELIEVED OF ALL OBLIGATIONS UNDER THIS AGREEMENT. BUYER AND SELLER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER IN THE EVENT BUYER DEFAULTS HEREUNDER. BUYER AND SELLER THEREFORE AGREE THAT A REASONABLE PRESENT ESTIMATE OF THE NET DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT OF BUYER'S DEFAULT OR BREACH HEREUNDER IS AN AMOUNT OF MONEY EQUAL TO THE DEPOSIT WHICH SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO APPLICABLE LAW. THE FOREGOING SHALL NOT LIMIT SELLER'S REMEDIES

WITH RESPECT TO THE ATTORNEYS' FEES PROVISION SET FORTH IN
PARAGRAPH 27 BELOW.

_____          _____
SELLER'S INITIALS                          BUYER'S INITIALS

b)   If Seller fails to perform its obligations under this Agreement (and such failure is not
cured within ten (10) days following written notice from Buyer to Seller of such failure),
arbitration is the only remedy that the Buyer has for dispute resolution, and both parties
hereby agree to arbitration for any default of contract by either party, and all costs for
counsel are not redeemable from either party. In consideration for Seller entering into this
Agreement with Buyer, Buyer expressly waives the remedy of specific performance of
Seller's obligations under this Agreement if Seller defaults hereunder and the ability to
record a lis pendens or similar notice against the Condominium Unit or Resort.

c)   If, after the Closing or termination of this Agreement, Buyer fails to perform its
obligations which expressly survive the Closing or termination of this Agreement, then
Seller may exercise any remedies available to it at law or in equity, in any order it deems
appropriate in its sole and absolute discretion, including but not limited to seeking specific
performance or damages. In such event, the liquidated damages provisions contained in
Paragraph 12(a)above shall not limit Seller's damages.

13. <u>Seller's Financing</u>. Seller may borrow (or may have borrowed) money from lenders (each, a
"Seller's Lender") for the acquisition, development, refinancing and/or construction of the
Resort and/or Condominium Unit (and any other units owned by Seller, if any). Buyer agrees
that any and each Seller's Lender will have, until closing, a mortgage on or other interest in the
Condominium Unit, and the Resort (or the real property upon which the Resort will be created),
with greater priority than any rights or interest Buyer may have therein, if any, pursuant to this
Agreement or under any principal of equity or otherwise. At the Closing, Seller shall cause the
then applicable mortgages to be released as an encumbrance against the Condominium Unit and
may use Buyer's closing proceeds for such purpose. Without limiting the generality of the
foregoing, Buyer's rights and interest under this Agreement (and the Deposit made hereunder)
will be subordinate to all mortgages, mezzanine and any other forms of financing (and all
modifications made to those mortgages, mezzanine and any other forms of financing) affecting
the Condominium Unit or the Resort (or the real property upon which the Resorts being
developed) even if those mortgages, mezzanine and any other forms of financing provided by a
Seller's Lender (or modifications) are made or recorded after the date of this Agreement.
Notwithstanding anything to the contrary contained in this Agreement, Buyer agrees that neither
this Agreement, nor Buyer's making the Deposit (and/or Seller's use of deposits as permitted
hereunder), will give Buyer any lien (equitable or otherwise) or claim against the Condominium
Unit, the Resort or the real property upon which the Resort has been (or will be) created and
Buyer knowingly, fully and unconditionally waives and releases any right to assert any such lien
or claim. Buyer hereby acknowledges and agrees that (i) any and each Seller's Lender is an
express third party beneficiary of this Paragraph, and (ii) this Paragraph and the rights of any
and each Seller's Lender under this Paragraph shall survive any termination, rescission or other
voiding of this Agreement, and any default by Seller under this Agreement.

14. <u>Assignment and Transfer</u>. Buyer shall not be entitled to assign this Agreement or its rights
hereunder without the prior written consent of Seller, which may be withheld by Seller with or

without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee. Any such assignee must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a direct or indirect transfer of any stock, voting interest, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement requiring consent. Without limiting the generality of the foregoing, Buyer shall not, prior to Closing, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Condominium Unit for lease, sale or resale, whether by placing an advertisement, listing the Condominium Unit with a broker, posting signs at the Condominium Unit or at the Resort, allowing the Condominium Unit to be listed for sale on the internet or the Multiple Listing Service or otherwise.

15. <u>Broker</u>. Seller has no responsibility to pay any sales commissions to any broker or sales agent with whom Buyer has dealt. Buyer will be solely responsible to pay any such other brokers. By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any broker, salesperson, agent or finder other than Seller's sales personnel, nor has the sale been procured by any real estate broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement).

16. <u>Notices</u>. Any notice, demand, consent, approval, request, or other communication or document to be provided hereunder to a party hereto shall be in writing and shall be given to such party at its address specified on its signature page hereto or such other address as such party may hereafter specify for that purpose by notice to the other party. Each such notice, request, or communication shall, for all purposes, be deemed given and received (a) if hand delivered against receipted copy, when the copy thereof is receipted, (b) if given by a recognized overnight delivery service, the day on which such notice, request, or other communication is actually received, or (c) if given by certified mail, return receipt requested, postage prepaid, two (2) days after it is posted with the United States Postal Service, to the addresses specified below. Notices by electronic mail or facsimile shall not be permitted.

17. <u>No Financing Contingency</u>. Buyer understands and agrees that Buyer will be obligated to pay "all cash" at Closing and this Agreement is not contingent upon Buyer obtaining financing. This Agreement and Buyer's obligations under this Agreement to purchase the Condominium Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender. Buyer will be solely responsible for making Buyer's own financial arrangements.

18 <u>Construction Specifications</u>. The Condominium Unit and the Resort will be constructed in substantial accordance with the plans and specifications therefor kept in Seller's construction office, as such plans and specifications are amended from time to time. Seller may make such changes in the plans and specifications that it deems appropriate at any time, to accommodate its in the field construction needs, and in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers. Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications". In furtherance of the understanding and agreement stated above, Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or

building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs. Buyer further acknowledges and agrees that (i) the plans and specifications for the Condominium Unit and the Resort on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications, and (ii) because of the day-to-day nature of the changes described in this Paragraph, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities). Without limiting the generality of this Paragraph, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications. Seller has not given and Buyer has not relied on or bargained for any such warranties. In furtherance of the foregoing, in the event of any conflict between the actual construction of the Condominium Unit and/or the Resort, and that which is set forth on the plans and specifications, Buyer agrees that the actual construction shall prevail and to accept the Condominium Unit and Resort as actually constructed (in lieu of what is set forth on the plans and specifications). Without limiting the generality of this Paragraph, Seller does not make any representation or warranty as to the level of vibrations, sound and/or odor transmission, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from vibration, sound and/or odor transmission. This Paragraph will survive the Closing.

19.  Condition of Condominium Unit. Buyer understands and agrees that, other than the "Standard Improvements" which include (i) cabinets, plumbing fixtures and tile in bathrooms, (ii) kitchen cabinets and standard appliances and (iii) one coat of primer on walls, the Condominium Unit is to be delivered at closing in "standard-finish condition". "Standard-finish condition" generally means that the Condominium Unit will be delivered in a condition which includes the Standard Improvements and is otherwise ready for decoration and finish by the Buyer after the Closing. Buyer further understands and agrees that certain items, if included with the Condominium Unit, such as tile, marble, stone, granite, cabinets, wood, stain, grout, wall and ceiling textures, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes in selection of suppliers, manufacturers, brand names or items, design professionals, including, without limitation, any interior designer or architect, or if Seller elects to omit certain items, Seller may modify the interior design concepts and the list of standard features or make substitutions for equipment, material, appliances, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost).

20.  Declaration.

a)  The Condominium Unit is located or will be located within a common interest community and is or will be subject to a declaration of covenants, conditions and restrictions to be recorded in the real property records of Riverside County, State of California (the "Declaration"). Seller may enter into a Declaration (and make changes thereto) in its sole discretion by providing Buyer with a copy of the Declaration (or such amendment), provided that Buyer will have fifteen (15) days from the date of receipt of the Declaration (or such amendment) from Seller to terminate this Agreement by delivering written notice to Seller of such termination and receive a refund of the Deposit with applicable interest earned, if any, if and only if the Declaration (or such changes) alter or modify the offering of the Condominium Unit in a manner material and adverse to Buyer that is not consistent with

other similar condominium projects in the same geographic area in which the Resort is located. Buyer will not be permitted to prevent Seller from entering into the Declaration (or making any changes it wishes to the Declaration) in its sole discretion. If Buyer has the right to terminate this Agreement pursuant to this Paragraph, Buyer's failure to request termination in writing within the 15-day period will mean that Buyer accepts the Declaration or such amendment, as applicable, and waives irrevocably Buyer's right so to terminate. All rights of termination set forth in this Paragraph will terminate, if not sooner, then absolutely at Closing.

b) Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (i) substitute the final legal descriptions and as-built surveys for the proposed legal descriptions and plot plans contained in the Declaration even though changes occur in the permitting stage and during construction, and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected and/or (iii) update the Declaration to reflect any changes in the applicable law after the date of this Agreement. The provisions of this Paragraph will survive the Closing.

21. <u>Amendments, Modifications, or Waivers</u>: No amendment, modification or waiver of any condition, provision or term shall be valid or of any effect unless made in writing signed by the party or parties to be bound or a duly authorized representative and specifying with particularity the extent and nature of such amendment, modification or waiver. Any waiver by any party of any default shall not affect or impair any right arising from any subsequent default. Except as expressly and specifically stated otherwise, nothing herein shall limit the remedies and rights of the parties hereto under and pursuant to this Agreement.

22. <u>Binding Effect</u>: This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

23. <u>Counterparts</u>: This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

24. <u>Headings</u>: Paragraph headings are for purposes of convenience and identification only and shall not be used to interpret or construe this Agreement.

25. <u>Entire Agreement; No Recordation</u>: There are no other agreements, promises or understandings between these parties relating to the sale of the Condominium Unit(s), except as specifically set forth herein. Neither this Agreement (nor a memorandum thereof) will be recorded, and if not understood, parties should seek competent legal advice.

26. <u>Applicable Law; Venue</u>: This legal and binding Agreement will be construed under California law without regard to principles of conflicts of law. Any action related to this Agreement shall be commenced in the federal or state courts in Riverside County, California USA. Each party hereto irrevocably consents to the exclusive jurisdiction of said courts and agrees that such courts are a convenient forum.

27. <u>Enforcement</u>. If either party hereto fails to perform any of its obligations under this Agreement or if a dispute arises between the parties hereto concerning the meaning or

interpretation of any provision of this Agreement, then the defaulting party or the party not prevailing in such dispute shall pay any and all costs and expenses incurred by the other party on account of such default and or in enforcing or establishing its rights hereunder, including, without limitation, court costs and attorneys' fees and disbursements. Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment. The terms of this Paragraph shall survive the Closing or earlier termination of this Agreement.

*[Signature Page Follows]*

*Please include the exact location of the Buyer's purchased unit on the floor plan as Exhibit A.*

*Please include the floor plan of the Buyer's purchased unit and indicate the total area of the unit as Exhibit B.*

IN WITNESS WHEREOF, all of the parties have executed this Agreement as of the date first set forth above.

"SELLER"

Hyde Morgan Development, LLC

By: _____
Name: _____
Its: Manager

"BUYER"

Wu Jnn

By: _____
Name: _____
Its: _____

EXHIBIT A

**FORM OF EXCLUSIVE RESORT CONDOMINIUM BUY-BACK AGREEMENT**

**RECORDING REQUESTED BY**

**AND WHEN RECORDED MAIL TO:**
Jeffwu818@icloud.com
_____
_____
_____

APN: _____

---

**EXCLUSIVE RESORT CONDOMINIUM BUY-BACK AGREEMENT**

HYDE COACHELLA VALLEY RESORT & RESIDENCES
Unit #: E102

THIS CONDOMINIUM BUY-BACK AGREEMENT (this "Agreement") is made and entered into as of ___70th, 9___, 201 6 (the "Effective Date") by and between HYDE MORGAN DEVELOPMENT, LLC, a Delaware limited liability company ("Seller") and ___Wu Jun___ ("Buyer").

Buyer and Seller have entered into that certain Resort Condominium Purchase and Sale Agreement dated ___70th, 9___, 201 6, (as amended, the "Contract") for the Buyer's purchase of Unit Number E102 with total area of 172.2 at the Hyde Coachella Valley Resort & Residences located near the intersection of Harrison Street and Vista Del Norte in Coachella, California, as more particularly described on Exhibit A attached hereto (the "Unit"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Contract.

WITNESSED THAT in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Seller and the Buyer hereby agree as follows:

1. Agreement to Buy-Back Unit. Buyer hereby irrevocably grants to Seller an exclusive right to buy-back the Unit for the Buy-Back Price (as defined herein) at any time commencing on the sixth (6th) anniversary of the Effective Date. Based on the Lease-Back Agreement, Seller will not buy back the Unit until the lease term terminates. Such buy-back right granted to Seller pursuant this Paragraph may be exercised (or not exercised) by Seller in its sole and absolute discretion, and notwithstanding anything to the contrary contained in this Agreement, if Seller fails to repurchase the Unit, then such failure shall not be deemed to be a default by Seller under the terms of this Agreement.

2. Right in the Unit. It is agreed between the Seller and the Buyer that this Agreement will constitute a first lien upon the Unit which, at the sole discretion of the Seller, may be recorded as presently constituted or alternatively as a Memorandum of Agreement, in either case, in the Official Records of Riverside County, California. Buyer shall be responsible for the costs of

1

recording this Agreement or any memorandum thereof.

3. <u>Buy-Back Price of Unit</u>. The purchase price to be paid by Seller to Buyer to repurchase the Unit (the "Buy-Back Price") shall be the following:

(a)     If the buy-back of the Unit occurs within the period commencing on the sixth (6th) anniversary of the Effective Date and expiring on the tenth (10th) anniversary of the Effective Date, the Buy-Back Price will be equal to **70%** of the Purchase Price.

(b)     If the buy-back of the Unit occurs within the period commencing on the eleventh (11th) anniversary of the Effective Date and expiring on the fifteenth (15th) anniversary of the Effective Date, the Buy-Back Price will be equal to **80%** of the Purchase Price.

(c)     If the buy-back of the Unit occurs within the period commencing on the sixteenth (16th) anniversary of the Effective Date and expiring on the twentieth (20th) anniversary of the Effective Date, the Buy-Back Price will be equal to **90%** of the Purchase Price.

(d)     If the buy-back of the Unit occurs within the period commencing on the twentieth (20th) anniversary of the Effective Date, the Buy-Back Price will be equal to **100%** of the Purchase Price.

The Buy-Back Price shall be paid by Seller to Buyer in a single lump sum payment upon the closing of the buy-back sale (the "Buy-Back Closing"). At the Buy-Back Closing, Buyer agrees to have all state and federal withholding tax liabilities arising from such repurchase of the Unit paid from proceeds of the Buy-Back Price to the extent that such withholding tax liabilities are required to be paid under applicable law.

4. <u>Buyer's Early Sale-Back</u>. In the event Buyer wishes to sell back the Unit to Seller prior to the commencement of the sixth (6th) anniversary of the Effective Date, Buyer shall deliver written notice to Seller of such election, and Seller shall have the right, in its sole and absolute discretion, to repurchase the Unit for a Buy-Back Price equal to **50%** of the Purchase Price.

5. <u>Closing of Buy-Back</u>. The Buy-Back Closing will take place on or before sixty (60) days after Seller delivers written notice to Buyer of Seller's election to repurchase the Unit for the Buy-Back Price, and at a time mutually agreed by and between the Buyer and Seller.

6. <u>Grant Deed</u>. On the Buy-Back Closing Date, Buyer shall execute and deliver a Grant Deed (the "Deed"), conveying title to the Unit, and such conveyance shall be free and clear of any and all encumbrances.

7. <u>Prorations and Closing Costs</u>. Buyer and Seller shall prorate on an accrual basis all expenses related to the Unit for the year in which the buy-back of the Unit is closed, including without limitation any real estate taxes and assessments, utility charges and the like. All monthly prorations shall be calculated on actual days of the applicable month and all annual prorations shall be calculated based on a 365-day year. By way of example only, Buyer shall be responsible for the real estate taxes and assessments for the period prior to the Buy-Back Closing Date and Seller shall be responsible for any real estate taxes and assessments for the Period from and after the Buy-Back Closing Date. All costs and expenses for the transaction contemplated by this

Agreement shall be allocated between Buyer and Seller in accordance with the customary practice of the city and county where the Unit is located for transactions of this type.

8. No Construction Against Drafter. Each party acknowledges and agrees that they have participated in negotiating and drafting this Agreement, and therefore if an ambiguity or a question of interpretation arises, this Agreement shall be construed as if the parties had drafted it jointly, as opposed to being construed against a party because it was responsible for drafting one or more of this Agreement's provisions.

9. Assignment. Neither Buyer nor Seller may transfer, assign, or encumber its rights under this Agreement without the written consent of the other party, such written consent to be granted or withheld by the other party in its sole and absolute discretion. Notwithstanding the foregoing, Seller shall have the right to assign, transfer or encumber of its rights in this Agreement to any of Seller's affiliates or any transferee of all or substantially all of Seller's interest in the Resort, and upon any transfer or assignment (but not encumbrance) Seller will be released from all liability or obligations hereto.

10. Enforcement. If either party hereto fails to perform any of its obligations under this Agreement or if a dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, then the defaulting party or the party not prevailing in such dispute shall pay any and all costs and expenses incurred by the other party on account of such default and or in enforcing or establishing its rights hereunder, including, without limitation, court costs and attorneys' fees and disbursements. Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment. The terms of this Paragraph shall survive the termination of this Agreement.

11. Attorneys' Fees. Each of the parties will pay its own attorneys' fees, except that of a party defaulting under this Agreement as outlined in Paragraph 10 above or any further agreed closing documents.

12. Default and Remedies. If Buyer defaults under this Agreement, Seller shall have all rights and remedies at law, including, without limitation, the right to seek specific performance of the Buyer's obligations hereunder. In addition, if Seller defaults in the performance of its obligations hereunder, and remains in default for a period of seven (7) days after the date Buyer delivers written notice of default to Seller, Buyer may seek damages that Buyer sustains as the result of such default; provided, that Buyer shall not be entitled to recover from Seller lost profits, or speculative, punitive, consequential or special damages. The terms of this Paragraph shall survive the termination of this Agreement.

13. Termination of the Contract. In the event that the Contract is terminated prior to the Closing thereunder, then this Agreement shall terminate, and neither party shall have any obligations hereunder other than those obligations that expressly survive the termination of this Agreement.

14. Notices. Any notice, demand, consent, approval, request, or other communication or document

3

to be provided hereunder to a party hereto shall be in writing and shall be given to such party at its address specified on its signature page hereto or such other address as such party may hereafter specify for that purpose by notice to the other party. Each such notice, request, or communication shall, for all purposes, be deemed given and received (a) if hand delivered against receipted copy, when the copy thereof is receipted, (b) if given by a recognized overnight delivery service, the day on which such notice, request, or other communication is actually received, or (c) or if given by certified mail, return receipt requested, postage prepaid, two (2) days after it is posted with the United States Postal Service, to the addresses specified below. Notices by electronic mail or facsimile shall not be permitted.

15. Buyer Representation. The Buyer represents and warrants to Seller that Buyer has full right, power and authority to enter into this Agreement, and each individual executing this Agreement on behalf of the Buyer has full authority to bind the Buyer and enter into this Agreement.

16. Amendments, Modifications, or Waivers: No amendment, modification or waiver of any condition, provision or term shall be valid or of any effect unless made in writing signed by the party or parties to be bound or a duly authorized representative and specifying with particularity the extent and nature of such amendment, modification or waiver. Any waiver by any party of any default shall not affect or impair any right arising from any subsequent default. Except as expressly and specifically stated otherwise, nothing herein shall limit the remedies and rights of the parties thereto under and pursuant to this Agreement.

17. Binding Effect: This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

18. Counterparts: This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument.

19. Headings: Paragraph headings are for purposes of convenience and identification only and shall not be used to interpret or construe this Agreement.

20. Entire Agreement: There are no other agreements, promises or understandings between these parties relating to the buy-back of the Unit, except as specifically set forth herein.

21. Applicable Law; Venue: This legal and binding Agreement will be construed under California law without regard to principles of conflicts of law. Any action related to this Agreement shall be commenced in the federal or state courts in Riverside County, California USA. Each party hereto irrevocably consents to the exclusive jurisdiction of said courts and agrees that such courts are a convenient forum.

22. Successor and Assigns. This Agreement shall be binding and shall inure to the benefit of the Buyer, Seller and their respective successors and assigns. The covenants set forth in this Agreement are appurtenant to and shall run with the properties described herein. As such, they shall be binding upon, and inure to the benefit of, all parties having any right, title or interest in and to such properties.

IN WITNESS WHEREOF, all of the parties have executed this Agreement as of the date first set forth above.

"SELLER"

Hyde Morgan Development, LLC

By: _____
Name: _____
Its:    Manager

"BUYER"

Wu  Jun
_____
By: _____
Name: _____
Its: _____

559005v5                                    5

**FORM OF AGREEMENT OF LEASE-BACK**

### HYDE COACHELLA VALLEY RESORT & RESIDENCES
### UNIT LEASE-BACK AGREEMENT
### UNDER MANAGEMENT OF: SBE ENTERTAINMENT

THIS AGREEMENT OF LEASE-BACK (this "Lease") is made and entered into this __20__ day of __9__ 201 __6__ (the "Effective Date"), by and between __Wu Jun__, the owner of the Unit ("Landlord") and HYDE MORGAN DEVELOPMENT, LLC, a Delaware limited liability company ("HYDE MORGAN").

**WHEREAS**, Landlord is the owner of a condominium unit number __L102__ with total area of __1222__ square feet(the "Unit") within the Hyde Coachella Valley Resort & Residences (the "Resort") located at the intersection of Harrison Street and Vista Del Norte in the City of Coachella, California, and is interested in leasing the Unit;

**WHEREAS**, HYDE MORGAN is in the business of leasing residential units for use as hotel suites and is desirous of leasing the Unit from Landlord and then including said Unit in the pool of resort suites to be managed by SBE Entertainment, an industry leader in award-winning hospitality and entertainment venues, as part of the Resort;

**NOW, THEREFORE**, for and in consideration of the sum of Ten Dollars ($10) and other good and valuable considerations and the covenants, conditions and agreements as are hereinafter set forth, the Landlord and HYDE MORGAN agree as follows:

1. **Leasing of Condominium Unit.** Landlord hereby leases unto HYDE MORGAN, and HYDE MORGAN herby leases from Landlord the Unit, which is part of the Resort. It is understood by and between the parties hereto that the Unit consists not only of the relevant condominium unit at the Resort but also all fixtures, furnishings, and appurtenances located within such condominium unit. HYDE MORGAN shall place the Unit in the pool of rooms to be used and rented by the management company for the Resort, SBE Entertainment.

2. **Rent.** HYDE MORGAN, in return for the use of the Unit and in consideration of the terms, conditions, covenants and provisions contained herein, shall pay Landlord the annual sum of $ __54,000__ (12% of the purchase price for the Unit) without offset or deduction (the "Rent"). Rent shall be paid to the Landlord on the last day of each month, in arrears, in monthly installments of $ __4500__ Rent shall be paid directly to Landlord either by check, wire transfer or other payment method agreed to by HYDE MORGAN and Landlord. In the case of wire transfers of Rent, a fee of up to $45 may be levied by Landlord.

3. **Cash Management.** HYDE MORGAN shall derive income from the general operations of the Resort which will include room charges paid by guests for the use of the suites (including the Unit), resort fees, services fees, food and beverage sales, spa services, etc. All revenue derived from all operations of the Resort shall be pooled into an operational account which shall be used to:

(i) Pay for hotel management and obligations under the hotel management agreement with SBE Entertainment (or any of its affiliates) and general operational expenses including

1

taxes;

    (ii) Pay rent income to the unit owners under their respective lease agreements; and

    (iii) Be pooled into a reserve account (the "Reserve Account"), which shall hold at least a
        12-month rental reserve for the rental fees due to unit landlords.

Any income distributions from the such revenue will not be taken by HYDE MORGAN unless
and until HYDE MORGAN is able to maintain in the Reserve Account, an amount equal to the
total amounts due to the landlords of the units at the Resort under their respective lease
agreements for a period of twelve months.

**4. Landlord's First Position on Reserve Account.** The respective landlords of the units within
the Resort shall be entitled to the first distributions of the funds from the Reserve Account prior
to any distributions taken therefrom by HYDE MORGAN.

**5. Term.**

5.1 The term of this Lease (the "Lease Term") shall be for the term selected by the Landlord below.
If no election is made regarding the Lease Term (as evidenced by the Landlord's initials next to a
selection below), the Lease Term shall automatically be twenty (20) years from the Effective Date, with
the first rental payment commencing on the first month after closing. The expected closing date
is July 2017.

    _____ 5-Year Term

    _____ 10-Year Term

    _____ 15-Year Term

    \_\_\_✓\_\_ 20-Year Term

In the event that the Effective Date occurs in the same month of closing, then within two (2)
business days following the Effective Date, HYDE MORGAN shall pay to Landlord an amount
equal to the Rent that Landlord would have received from HYDE MORGAN under this Lease if
the Effective Date was July 2017.

5.2 Upon selection of the Lease Term, Landlord unconditionally agrees that this selection of term
cannot be changed at a later date.

5.3 In the event Landlord repurchases the Unit pursuant to the Buy-Back Agreement (including,
without limitation, pursuant to Paragraph 5 thereof entitled "Buyer's Early Sale Back"), then this
Lease shall immediately terminate upon the date of the closing of such repurchase.

## 6. Condition of Condominium Unit.

6.1 HYDE MORGAN hereby acknowledges that, as of the beginning of the Lease Term, HYDE
MORGAN has inspected the Unit and its fixtures, furniture, furnishings, and appurtenances are in
good repair and tenantable condition.

6.2 This Lease and HYDE MORGAN's interest in the Unit are and shall be subject, subordinate,
and inferior to any lien or encumbrance now existing or hereafter placed on the Unit by Landlord

or Landlord's lender (if any), to all advances made under any such lien or encumbrance, to the interest payable in respect of any such lien or encumbrance, and to any and all renewals and extensions of any such lien or encumbrance. Notwithstanding anything contained in this Lease to the contrary, this Lease shall not be subject, subordinate or inferior to any lien or encumbrance now existing or hereafter placed on the Unit by Landlord or Landlord's Lender, to all advances made under any such lien or encumbrance, to the interest payable in respect of any such lien or encumbrance, or to any and all renewals and extensions of any such lien or encumbrance unless, in each case, Landlord shall obtain for HYDE MORGAN a non-disturbance agreement from Landlord's Lender that provides that the possession of HYDE MORGAN shall not be disturbed or evicted and that this Lease and HYDE MORGAN'S rights hereunder shall not be terminated or otherwise adversely affected as a result of any foreclosure of any lien or encumbrance placed on the Unit by such Landlord's Lender, and any sale pursuant to any such foreclosure or the delivery of a deed in lieu of foreclosure, or other acquisition of Landlord's interest in the Unit pursuant to the enforcement of remedies by Landlord's Lender.

## 7. HYDE MORGAN's Obligations and Responsibilities.

Subject to Paragraph 9 below:

7.1 HYDE MORGAN agrees to keep and maintain the Unit in good and clean condition, excepting reasonable wear and tear, and shall have the right to make necessary (as determined by HYDE MORGAN) alterations, improvements or additions thereto without Landlord's written consent. All alterations, improvements or additions built, constructed or placed on the Unit by HYDE MORGAN shall be made in accordance with all applicable ordinances, codes, rules, regulations, and laws, shall be at HYDE MORGAN's sole expense, and shall become the property of Landlord and remain on the Unit at the expiration or earlier termination of this Lease.

7.2 HYDE MORGAN shall keep all sinks, lavatories, commodes and all other plumbing open and operable, at HYDE MORGAN's sole expense.

7.3 HYDE MORGAN shall be liable for and shall promptly pay for all loss, damage, government fines, or fees, costs and expenses of all repairs made necessary by, or resulting from, HYDE MORGAN's intentional or grossly negligent destruction, defacement, impairment or removal of any part of the Unit or HYDE MORGAN knowingly, recklessly or grossly negligently permitting any person (other than Landlord) to do so.

7.4 HYDE MORGAN shall not, or permit any of HYDE MORGAN's guests, invitees or subtenants to, (a) keep any item of a dangerous, flammable or explosive character that might unreasonably increase the danger of fire or explosion or that might be considered hazardous or extra hazardous by any responsible insurance company; (b) engage in the manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute or use illegal drugs, controlled substances or drug paraphernalia; (c) engage in acts of violence or threats of violence, including, but not limited to, the unlawful discharge of firearms; (d) engage in any other similar illegal activities, all of such on or within 1,000 feet of the Unit; provided, however, HYDE MORGAN shall not be deemed to "permit" any of HYDE MORGAN's guests, invitees or subtenants to take any of the actions set forth in the preceding clauses (a) through (d), unless HYDE MORGAN has acted with fraud, gross negligence or willful misconduct in allowing such actions to occur.

7.5 HYDE MORGAN along with its designated management company for the Resort shall exercise commercially reasonable efforts to ensure that the entire Unit is maintained in good order and repair, excepting reasonable wear and tear.

7.6 HYDE MORGAN shall be solely responsible for paying for all utilities furnished to the Unit during the Lease Term. Landlord shall not be liable for death, injury, damage or loss to person or property resulting from the interruption of heat, gas, electricity, water, sewer, telephone, cable television or any other utility services, or for the malfunction of machinery or appliances serving the Unit. Landlord shall not be liable for death, injury, damage or loss to person or property caused by any defect in the heating, gas, electricity, water, or sewer systems serving the Unit.

## 8. Breach, Abandonment, Forfeiture and Termination.

8.1 Upon HYDE MORGAN's failure to make any payment of Rent or other sum payable under this Lease to Landlord when due and such failure continues for more than 30 days, or upon HYDE MORGAN's breach of any other material term, condition, covenant, or provision herein contained, or if HYDE MORGAN abandons or vacates the Unit prior to the expiration of the Lease Term, then, Landlord may, in its sole and absolute discretion, offer a cure notice to HYDE MORGAN, giving HYDE MORGAN a 30-day period to cure such violation; provided, however, if such default cannot reasonably be cured within such 30-day period, HYDE MORGAN shall not be in default if it commences to cure within such 30-day period and diligently prosecutes the same to completion (provided said cure is completed within 120 days). If HYDE MORGAN fails to cure such violation within the applicable cure period set forth above, Landlord may, at its sole discretion, peacefully re-enter and repossess the Unit. In the event of such re-entry and repossession by Landlord, such re-entry and repossession shall not be deemed an acceptance by Landlord or a surrender of any rights of Landlord or otherwise constitute a release of HYDE MORGAN from the terms of this Lease. It is intended that Landlord's remedies shall be as broad as permitted by prevailing law. The exercise of any one remedy shall not be deemed exclusive of the right to collect the entire amount of unpaid Rent or damages, or of Landlord's right to avail itself of any remedy allowed by prevailing law.

8.2 Further, should HYDE MORGAN fail to pay all of the Rent due under Paragraph 2 above for a period of two (2) or more consecutive months, Landlord shall be entitled to (a) cause HYDE MORGAN to lose all of its rights under the Buy-Back Agreement and (b) transfer title of the Unit to any person or entity of its choosing without restriction.

8.3 If HYDE MORGAN does not pay the full amount of Rent due under Paragraph 2 above and such failure continues for more than 30 days, HYDE MORGAN shall pay a late payment fee to Landlord of $500, and all past-due Rent shall incur interest at a rate of 10% per annum until paid in full.

## 9. Damage to the Condominium Unit.

9.1 If the Unit is partially damaged or destroyed by fire or other casualty not attributable to the gross negligence or willful misconduct of HYDE MORGAN or HYDE MORGAN's guests or management company, invitees or subtenants, the Unit shall be promptly restored and repaired by Landlord and any Rent for the period that the Unit is untenable shall abate.

9.2 Notwithstanding the foregoing, it is expressly understood and agreed that HYDE MORGAN shall not be excused from paying Rent if the damage or destruction to the Unit is the result of or is attributable to the gross negligence or willful misconduct of HYDE MORGAN or HYDE MORGAN's guests, invitees or subtenants, and HYDE MORGAN shall be responsible for the cost and expense of any repairs or clean-up of the Unit attributable to such gross negligence or carelessness.

10. **Common Areas.** Various areas of the Resort are designed and intended for the use in common by all owners of the units at the Resort and their guests. including, but not limited to, walkways and other amenities, which shall be used by HYDE MORGAN in accordance with the Declaration (defined below) and any related rules and regulations. As used herein, the term "Declaration" shall mean the Declaration recorded in the Official Records of Riverside County, State of California as Instrument No. _____ on _____, 201_.

11. **Warranties of Title and Quiet Possession.** The Landlord covenants that Landlord has good and marketable title to the Unit with the full right to make this Lease, subject to all matters of record, and covenants that HYDE MORGAN upon making payment of the Rents and the keeping of the other covenants herein contained therefor shall have quiet and peaceful possession of the Unit during the term hereof.

12. **Insurance.**

12.1 HYDE MORGAN agrees that any insurance coverage for the Unit and any subtenants, guests, and/or invitees is solely the responsibility of HYDE MORGAN.

12.2 HYDE MORGAN and its management company for the Resort shall carry Commercial General Liability insurance in a sufficient amount to secure the risks and obligations of Landlord and cause the Landlord to be added as party insured under such policy, and to furnish the Landlord with a certificate of such insurance, together with a receipt showing the premium has been paid.

12.3 All policies of insurance under this Paragraph 12 shall contain the clause that the same shall not be canceled except and until fifteen (15) days after written notice to the Landlord.

13. **Indemnification of Landlord.** HYDE MORGAN agrees to protect, defend, reimburse, indemnify and hold the Landlord forever, free and harmless at all times from and against any and all claims, liability, expenses, losses, costs, fines and damages (including reasonable attorneys' fees) and causes of action of every kind and character (to the extent permitted by applicable law, and except to the extent caused by the Landlord's negligence or willful misconduct) by reason of any damage to the Unit, or bodily injury (including death) incurred or sustained by any party hereto, any agent, tenant, guest, invitee or employee of any party hereto, or any other person whomsoever, or any governmental agency, arising out of or incident to or in connection with the HYDE MORGAN's performance under this Lease, HYDE MORGAN's use or occupancy of the Unit, HYDE MORGAN's acts, omissions or operations hereunder or any breach by HYDE MORGAN of the terms of this Lease. HYDE MORGAN recognizes the broad nature of this indemnification and hold harmless clause, and voluntarily makes this covenant and expressly acknowledges the receipt of such good and valuable consideration provided by the Landlord in support of this indemnification. This clause shall survive the termination of this Lease. Compliance with the insurance requirements herein shall not relieve HYDE MORGAN of its liability or obligation to

5

indemnify the Landlord as set forth in this Article.

**14. Subletting.** HYDE MORGAN may sublet its right, title or interest in or to all or any portion of the Unit without obtaining the written consent of the Landlord.

**15. Right of Annual Usage.** On an annual basis and subject to an availability calendar which will be provided to Landlord and will include blackout times (described below), Landlord may use the Unit as a personal residence for a consecutive period of up to two weeks free of charge. In order to exercise this option, Landlord must inform HYDE MORGAN of his or her intention to use the Unit at least ninety (90) days before the first date of usage. Provided that the Unit is available, Landlord will make all necessary arrangements for the use of the Unit. Landlords shall receive coupons for their annual stay at their Units and shall book their own reservations using these coupons. Notwithstanding anything to the contrary contained herein, Landlord further acknowledges and agrees that the entire calendar months of March and April of each calendar year shall be blackout times, and Landlord will be unable to exercise its annual stay during these two

(2) months and other "busy" times as selected by the management company for the Resort.

16.     **Notice.** Any notice, demand, consent, approval, request, or other communication or document to be provided hereunder to a party hereto shall be in writing and shall be given to such party at its address specified on its signature page hereto or such other address as such party may hereafter specify for that purpose by notice to the other party. Each such notice, request, or communication shall, for all purposes, be deemed given and received (a) if hand delivered against receipted copy, when the copy thereof is receipted, (b) if given by a recognized overnight delivery service, the day on which such notice, request, or other communication is actually received, or (c) or if given by certified mail, return receipt requested, postage prepaid, two (2) days after it is posted with the United States Postal Service, to the addresses specified below. Notices by electronic mail or facsimile shall not be permitted.

17.     **Miscellaneous.**

17.1 This Lease supersedes any and all other contracts or agreements between the parties. The parties hereby agree and acknowledge that this Lease constitutes the entire agreement between the parties regarding the lease of the Unit, and there are no oral or written amendments, modifications, or other agreements or representations regarding the lease of the Unit.

17.2 This Lease and all rights, remedies, and obligations under this Lease, including matters of construction, validity, and performance, shall be governed by the laws of the State of California without regard to the principles of conflicts of law. Any action related to this Lease shall be commenced in the federal or state courts in Riverside County, California USA, each party hereto irrevocably consents to the exclusive jurisdiction of said courts and each party hereto agrees that such courts are a convenient forum.

17.3 If any portion of this Lease is held invalid, then the other portions shall be deemed valid, and so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid.

17.4 Each of the parties hereto agree to execute any additional documents or instruments and to

perform any acts which may be reasonably requested by the other party hereto and which are reasonably necessary or proper to carry out the purposes of this Lease.

17.5 This Lease may be executed in any number of counterparts with the same effect as if all of the parties hereto have signed the same document and all counterparts shall constitute one Lease. Signatures received by facsimile or by electronic mail shall be deemed original signatures for all purposes of this Lease.

17.6 No amendment, modification or waiver of any condition, provision or term shall be valid or of any effect unless made in writing signed by the party or parties to be bound or a duly authorized representative and specifying with particularity the extent and nature of such amendment, modification or waiver. Any waiver by any party of any default shall not affect or impair any right arising from any subsequent default. Except as expressly and specifically stated otherwise, nothing herein shall limit the remedies and rights of the parties thereto under and pursuant to this Lease.

17.7 This Lease shall be binding upon and inure to the benefit of the parties hereto and their respective personal representatives, successors and assigns.

17.8 Paragraph headings are for purposes of convenience and identification only and shall not be used to interpret or construe this Lease.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first written above.

"HYDE MORGAN"

Hyde Morgan Development, LLC

By: _____

Name: _____

Its:    Manager

"LANDLORD"

Wu  Jun

By: _____

Name: _____

Its: _____

**CONFIDENTIAL TERMINATION AGREEMENT AND GENERAL RELEASE**

THIS CONFIDENTIAL TERMINATION AGREEMENT AND GENERAL RELEASE (this "Agreement") is made and entered into as of this ___/0th__ day of ___5___, 2017 ("Effective Date") by and between Hyde Morgan Development, LLC, a Delaware limited liability company ("Developer") and ___Jun Wu___ ("Client") with reference to the following facts.

## RECITALS

A.     In connection with Developer's planned luxury hotel resort project in the City of Coachella, California and Client's interest in purchasing a condominium unit in the project, Developer and Client entered into certain agreements consisting of a Resort Condominium Purchase and Sale Agreement dated _Sep 20th_, 20/6 and related Unit Lease Back Agreement and Exclusive Resort Condominium Buy-Back Agreement which together with any escrow agreement and other ancillary agreements are hereinafter collectively referred to as the "Hyde Agreements."

B.     Pursuant to the Hyde Agreements, Client delivered to Developer a reservation deposit in the amount of $ _180, 000/_ ("Reservation Deposit").

C.     Client desires to terminate the Hyde Agreements and obtain a refund of its Reservation Deposit and Developer desires to terminate the Hyde Agreements and refund the Reservation Deposit to Client on the terms and conditions set forth below.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, Developer and Client agree as follows:

1.     Termination and Refund of Reservation Deposit.  Developer and Client hereby mutually agree to terminate the Hyde Agreements as of the Effective Date. The parties agree that the provisions of the Hyde Agreements and any and all agreements, instruments, certificates or other documents entered into at any time between Developer and Client in connection with Client's interest in purchasing a condominium unit in Developer's Coachella hotel resort project, except this Agreement, are hereby deemed rescinded, terminated and voided ad initio and shall be of no further force and effect for any purpose whatsoever and the transactions, arrangements and relationships set forth therein shall be deemed rescinded and terminated and of no force and effect. Within forty-five (45) business days after Client executes and delivers a signed copy of this Agreement to Developer and provides Developer written wire instructions for the refund of the Reservation Deposit, Developer shall refund the Reservation Deposit to Client by check.

2.     Mutual Release.

2.1     Except with respect to obligations owed under this Agreement, Developer on behalf of itself and its subsidiaries and affiliates and their respective representatives, successors, assigns, employees, attorneys, advisors and agents (collectively, "Developer

1

Releasing Parties"), for good and sufficient consideration, the receipt of which is acknowledged, release absolutely and forever discharge Client, from any and all actual or possible claims, charges, damages, demands, debts, liabilities, losses, accounts, reckonings, obligations, suits, actions and causes of action of every kind and nature whatsoever, including, but not limited to, those arising under contract, statute or common law, whether or not known or suspected at this time, which the Developer Releasing Parties have, or ever had, owned or held, or hereafter can, shall or may have against Client, based upon, arising out of, related to, or by reason of any cause, occurrence, event, act, fact, circumstance, thing, statement or omission occurring before the date of this Agreement relating to, arising from or in connection with the Hyde Agreements. The release granted pursuant to this Section 2.1 shall be deemed rescinded, terminated and voided and shall be of no further force and effect for any purpose whatsoever to the extent Client fails to fulfill its obligations set forth in Section 3 hereof.

2.2     Except with respect to obligations owed under this Agreement, Client, on behalf of itself and its representatives, administrators, executors, heirs, successors and assigns (collectively, "Client Releasing Parties"), for good and sufficient consideration, the receipt of which is acknowledged, absolutely release and forever discharge Developer and its predecessors, successors, assigns, parents, subsidiaries, divisions, holding companies and affiliates, and each of their respective former, current and future officers, directors, owners, members, managers, employees, contractors, partners, associates, representatives, stockholders, attorneys, advisors and agents (collectively, "Developer Released Parties"), from any and all actual or possible claims, charges, damages, demands, debts, liabilities, losses, accounts, reckonings, obligations, suits, actions and causes of action of every kind and nature whatsoever, whether in law or equity, known or unknown, suspected or unsuspected, which the Client Releasing Parties ever had, now have, or hereafter shall or may have in any way arising out of, in connection with, or by reason of any act, omission, matter cause or thing whatsoever, from the beginning of time through the Effective Date, including but not limited to those arising from, asserted in, or related to the Hyde Agreements.

2.3     It is the intention of the parties in executing this Agreement that this instrument shall be effective as a full and final accord and satisfaction and general release of each and every released matter.  **IN FURTHERANCE OF THIS INTENTION, EACH OF THE PARTIES HERETO EXPRESSLY WAIVES ANY AND ALL RIGHTS THAT MIGHT BE CLAIMED BY REASON OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES AS FOLLOWS:**

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

2.4     Nothing in this Agreement shall release any party hereto from the obligations created by this Agreement.

3.      Confidentiality/Non-Disparagement. The parties agree that the underlying facts the fact of the settlement embodied by this Agreement, the terms and conditions of thi

2

Agreement and the negotiations pertaining to this Agreement are confidential and shall not be disclosed by any party to any person or entity except to such party's attorneys, accountants or financial advisors provided such attorneys, accountants or financial advisors agree to keep the information strictly confidential or to any taxing authority to the extent required for tax purposes and except to the extent necessary to enforce the terms of this Agreement or to the extent required by law or court order. Client shall not to do or say anything in the future to disparage or otherwise impugn the commercial or personal reputation of Developer and its predecessors, successors, assigns, parents, subsidiaries, divisions, holding companies and affiliates, and each of their respective former, current and future officers, directors, owners, members, managers, employees, contractors, partners, associates, representatives, stockholders, attorneys, advisors and agents. Client shall defend, indemnify and hold harmless the Developer Released Parties from and against any and all damages, judgments, settlements, liabilities, obligations, losses, fines, penalties, costs and expenses (including, without limitation, the actual fees and disbursements of attorneys, accountants, experts and other professionals) that may be paid, incurred, sustained or suffered by the Developer Released Parties as a result of, arising out of or relating to any breach or threatened breach of this Section 3 by either Client or any of its agents, employees, representatives, attorneys and consultants and such indemnity shall survive the termination of this Agreement.

4.  Miscellaneous.

4.1  Amendment and Modification. This Agreement may be amended, modified and supplemented only by written agreement of the parties hereto.

4.2  Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall fail to be in effect only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement or of any such provision.

4.3  Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California. The parties mutually consent to the jurisdiction of the federal and state courts in Orange County, California and agree that any action, suit or proceeding concerning, related to or arising out of this Agreement shall be brought only in a federal or state court in Orange County, California, and the parties agree that they will not raise any defense or objection or file any motion based on lack of personal jurisdiction, improper venue, inconvenience of the forum or the like in any case filed in a federal or state court in Orange County, California.

4.4  Counterparts; Execution. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or pdf attachment to electronic mail shall be equally as effective as delivery of an original executed counterpart. Any party delivering an executed counterpart of this Agreement

by facsimile or electronic mail shall also deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

      4.5    Entire Agreement. This Agreement supersedes any prior agreements, negotiations and communications, oral or written and contains the entire agreement between the parties as to the subject matter hereof.

      4.5    Non-Admission Of Liability. Neither this Agreement nor anything contained herein shall constitute or be construed as an admission by any party hereto as evidence of any liability, wrongdoing, or unlawful conduct.

      4.6    Language Version. The Chinese language contained within the Agreement is only for ease of understanding as to the terms and conditions of the Agreement. If there is any inconsistency or conflict between the English and Chinese versions, the English version shall prevail for all purposes.

[SIGNATURES FOLLOW ON THE NEXT PAGE]

IN WITNESS WHEREOF, Developer and Client have executed this Agreement as of the date first written above.

**"Developer"**

HYDE MORGAN DEVELOPMENT, LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**"Client"**

_____

[NAME]

5

GHB (2017) 118

## 购房解除协议

此解除协议由 Hyde Morgan Development, LLC ("卖方") 与 _吴平_ ("买方"，
身份证号: ▇▇▇▇▇▇▇▇▇ ) 于 _2017_ 年 _5_ 月 _10_ 日签署。

鉴于双方于 _2016_ 年 _9_ 月 _20_ 日签署了《Resort Condominium Purchase and Sale
Agreement》("原合同")，由买方认购位于 _美国 棕榈泉 酒店_
房号为 _E102_ 的房屋，现买方向卖方申请解除原合同，卖方同意买方的请求。因此，
双方在此合意解除原合同，免除对方的原合同义务。

此解除协议自双方签字之日起生效。买方已支付的定金 _180000 美金_ 将于协议生效
后的 _45_ 个工作日内退还买方。

Hyde Morgan Development, LLC                买方

签字: _Seren Shi_                            签字: _____

日期: _2017_ . _5_ . _17_ .              日期: _2017_ . _05_ . _10_

1/1





**RESERVATION FORM – SUBJECT TO CONTRACT**

## 购房预订单–以最终购房协议为准

**万国置地**
Global House Buyer

Project Name 项目名称: 棕榈泉海徒逸库

预订单编号: 2016030630

### Reservation Details 购房预定详情

| | |
|---|---|
| Reservation Date 购房预订日期: 20 / 6 年 9 月 13 日 | Reservation fee 定金金额: 2000 付款方式: |
| Purchase Price 购房价格: | Plot No. 购买房号: |
| Area 面积: | Loan or not 是否贷款: |
| Deposit Amount 首付款金额: | |

**Agreements Shall Be Signed Before** 购房协议签订日期为本预订单签署后 三个工作日之内，逾期未签署视为放弃，该客户排号资格取消，该房源自动转入待售池由排号靠前的其他客户从中选择。

**Deposit Shall Be Paid Before** 首付款支付期限为签订购房协议后七个工作日内，逾期未支付，购房合同终止。

Remark 备注: 棕榈泉海徒逸库排号费, 不退

### Client Information 购房者信息

| | |
|---|---|
| Name 姓名: 吴革 | Contact No. 联系电话: 13801301818 |
| Passport No.护照号码: | Email 邮箱: |

### Confirmation Signatures 确认签字及印鉴

| | |
|---|---|
| Client Signature 客户签字: 吴革 | Signature Date 签字日期: 2016.09.13 |
| Sales Signature 顾问签字: 郎阿锋 | Cashier Signature 出纳签字: 陈 Iu　Date 日期: 2016.09.13 |

Global House Buyer Sealed
万国置地盖章:

Copy Distribution: One copy is for Client, another one is for Global House Buyer 本预订单一式两份，购房者持有一份，万国置地持提示: 客户未在上述规定时间内签订购房协议或签订了购房协议但未在上述规定时间内支付首付款的，均可书面申请领回已金，我司收到申请后将在七个工作日内完成退款事务办理。

为了更好地为客户服务，促进我们的工作，现公布监督及投诉电话，请各位新老客户知悉。

投诉电话: 18515023389

GHBC 万国置地

全球服务，海外置业从此更简单

热线电话：400-606-5355
网址：www.housebuyer.cn
北京总部：北京市东城区东长安街1号，东方广场C2座2层
Floor 2, Building C2, Oriental Plaza, No. 1East
an Avenue, Beijing, China. 100006

# 付款指令

收款账户名称：万国置地（北京）房地产经纪有限公司

开户银行名称：建设银行北京东方广场支行

收款账户号码：11050160590000000331

上海分公司：上海市静安区南京西路1468号，中欣大厦31层
Floor 31, No. 1468, United Plaza, West Nanjing Road, Shanghai, China. 200040

深圳分公司：深圳市福田区益田路6001号太平金融大厦40层
Floor 40, Taiping Tower, No. 6001, Yitian Road, Futian District, ShenZhen China. 100006

